UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,          CASE NO: 14-20550-CR-ALTONAGA-5

      Plaintiff,

v.

LAZARO DANIEL COLLAZO,

      Defendant.

_____/

## DEFENDANT'S MOTION FOR THE ISSUANCE OF RULE 17(C) SUBPOENAS AND TO COMPEL THE UNITED STATES ATTORNEYS' OFFICE AND MAJOR LEAGUE BASEBALL TO COMPLY WITH THE SUBPOENAS PRIOR TO TRIAL

Defendant, LAZARO COLLAZO, by and through the undersigned counsel and pursuant to Rule 17(c), Fed. R. Crim. P., hereby moves this Honorable Court to issue the attached Rule 17(c) Subpoenas and compel the United States Attorneys' Office and Major League Baseball to comply with the Rule 17(c) Subpoenas in the form attached as *Composite Exhibit 1*, prior to trial. In support of his Motion, the Defendant states as follows:

### INTRODUCTION

Pursuant to Rule 17(c), Fed. R. Crim. P., Mr. Collazo seeks to obtain the production of relevant and material documents from the United States Attorneys' Office and Major League Baseball prior to trial in the above-styled cause on February 9, 2015. Based on the discovery received to date, the documents sought herein are presumably voluminous in nature, will assist the Defendant in presenting his defenses at trial, and therefore their production is being sought in advance of trial to preserve Mr. Collazo's due process rights and prevent unnecessary delays at trial.

## THE INDICTMENT

The Superseding Indictment consists of eight (8) Counts pertaining to four (4) individuals, including Mr. Collazo, who is charged in Counts one (1), two (2), and eight (8).[1] In sum, the Government alleges that from 2007 through August 6, 2013, Mr. Collazo conspired with other individuals to distribute Schedule III controlled substances, specifically testosterone and Human Growth Hormone, as well as distributing Human Growth Hormone to an individual on or about June 2012. Based on the undersigned's review of the discovery provided to date, the charges pertaining to Mr. Collazo stem in large part from accusations made by a cooperating Government witness, Anthony P. Bosch (hereinafter "Bosch"), to DEA Agents during the course of nine (9) interviews. Anthony Bosch had previously been providing assistance to Major League Baseball (hereinafter "MLB"), in its disciplinary actions against players who were receiving Performance Enhancing Substances (hereinafter "PES") from Bosch.

## THE PARTIES

### A. <u>Major League Baseball</u>

The Office of the Commissioner of Baseball is the executive/managing arm of MLB located in New York, New York. As has been reported at length in national media outlets, MLB has an interest in the DEA's investigation into Bosch and his alleged co-conspirators, as well as the resulting prosecution, due to the involvement of MLB Players. However, what was previously unknown is the extent of MLB's involvement in the investigation and prosecution at issue herein. In essence, MLB's fingerprints are all over the evidence, statements, and allegations concerning the Biogenesis case and Mr. Collazo. In fact, according to the March 21, 2013 Affidavit in Support

---

[1] The original Indictment contained eight (8) Counts pertaining to five (5) individuals, some of which have already pled guilty. Mr. Collazo was only charged in Count I of the original Indictment.



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

of Application for the Continued Interception of Wire and Electronic Communications for the cellular telephone of Carlos Acevedo, an alleged co-conspirator and cooperating witness, "*in September 2012, representatives from Major League Baseball approached DEA concerning individuals under investigation by the MLB Department of Investigations (hereinafter referred to as "MLB DOI")...MLB DOI provided DEA with information connecting Sucart and Bosch to numerous MLB players.*"[2]

MLB's involvement in this cause did not cease after jumpstarting the DEA's investigation. Instead, MLB has presumably steered, impeded and/or controlled the DEA's investigation and the USAO's prosecution thereafter. Noticeably, over 50% of the discovery furnished by the Government, which consists of over 200 CDs and thousands of pages of reports and documents, contain MLB batestamps. The Government has previously confirmed that any documents with MLB batestamps were furnished by MLB and thus were either obtained by, or in the possession of MLB, prior to the Government obtaining them. In conjunction with the DEA's investigation, MLB DOI conducted its own independent investigation through largely improper means, such as paying/bribing witnesses, purchasing stolen documents, withholding evidence, and influencing testimony/statements by witnesses.[3] The full extent of MLB's involvement in the present investigation and the prosecution of Mr. Collazo is yet unknown. Presently, the undersigned is seeking the disclosure of documents that go directly to the heart of the charges against Mr. Collazo and that would show that MLB directly influenced/altered the testimony of the cooperating witnesses against Mr. Collazo.

---

[2] *A copy of the relevant portion of SA Grafenstein's March 21, 2013 Affidavit is attached hereto as Exhibit 2.*
[3] MLB's relevant actions herein will be set out in further detail with substantiating evidence in the following section of the instant Motion.



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446–0303 • Fax: (305) 446–4503

In an effort to expedite a resolution to this matter and obtain production of these relevant and likely exculpatory documents, the undersigned counsel conferred in good faith, pursuant to Local Rule 88.9, with John D. Couriel of Kobre & Kim, LLP., who represent MLB. The undersigned provided Mr. Couriel a draft of the intended Rule 17(c) subpoena, and inquired if Mr. Couriel's firm would accept service on behalf of MLB. To further streamline the use of these documents at trial, pursuant to Rule 902(11), Fed. R. Evid., the undersigned counsel provides a Certification of Domestic Records of Regularly Conducted Activity along with the Rule 17(c) Subpoenas, to be executed and returned with the documents. An executed Certification could prevent the need to have to call a witness simply to authenticate the documents and further delay the trial in this matter.

Mr. Couriel advised the undersigned that he would accept service on behalf of MLB, but advised that "*the subpoena is objectionable on numerous grounds, and MLB reserves its right to object to it, in whole or in part and on any basis, at an appropriate time. For now, it suffices to say that, to the extent that you purport to command MLB to do anything before trial, you have no basis to do so under Rule 17(c), and MLB will not be undertaking to provide you with anything on November 21, 2014, or at any time before trial.*" As a result of MLB's position as to the production of documents prior to trial, the undersigned counsel has been forced to file the present Motion to have this Honorable Court issue the attached Rule 17(c) Subpoena and compel MLB to comply with the Subpoena prior to trial.

### B. Department of Justice/United States Attorneys' Office

The United States Attorneys' Office for the Southern District of Florida (hereinafter USAO) is the prosecuting office overseeing the investigation by the DEA into Mr. Collazo and his alleged co-conspirators. Specifically, AUSA Michael "Pat" Sullivan and AUSA Sharad Motiani have been the prosecutors handling this investigation. Furthermore, as stated previously, this investigation



QUINTERO BROCHE
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

was initiated as a result of information provided to the Government by MLB. As of the date of this filing, the investigation has resulted in double-digit arrests, including Mr. Collazo. Most of the alleged co-conspirators have or will plead guilty prior to Mr. Collazo's trial on February 9, 2015.

Based on the investigative reports and other discovery provided, it is clear that the USAO filed the Indictment against Mr. Collazo in large part on the accusations of Mr. Bosch, without making any attempt to substantiate the allegations concerning Mr. Collazo prior to his arrest or the original Indictment herein. In fact, Mr. Collazo, whose charges stem from the alleged distribution of PES to minors and/or their recruitment to Biogenesis, was indicted prior to any minor and/or their parents being interviewed. Suggestively, at the time of Mr. Collazo's arrest, the USAO and DEA issued a statement touting Mr. Collazo's arrest and highlighted that his arrest stemmed from Mr. Collazo's recruitment of numerous minors to Biogenesis.[4] The undersigned counsel, on behalf of Mr. Collazo, refuted these accusations publically. It was only after refuting the Government's allegation as to the amount of minors involved, that the Government undertook to interview the alleged minors involved. Furthermore, it has become apparent that numerous individuals with ties to MLB have been granted immunity and/or not prosecuted by the USAO, even though these individuals have committed acts which would constitute serious crimes and that further impeded the Government's own investigation.

As a result of MLB's pervasive influence over the investigation and the USAO's handling of the case, the undersigned counsel is seeking the production of relevant documents/communications with Mr. Collazo's prior counsel, any and all witnesses (individuals) receiving any form of

---

[4] Bosch, as per the Government's statement, admitted to giving PES to at least eighteen (18) minors. The USAO's statement regarding Mr. Collazo's arrest expressly attributed the recruitment of many of these alleged minors to Biogenesis to Mr. Collazo.

5



QUINTERO BROCHE
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

immunity, as well as any and all alleged co-conspirators at issue herein. In an attempt to avoid the need for a subpoena, the undersigned counsel conferred in good faith, pursuant to Local Rule 88.9, with AUSA Sullivan and requested the production of the documents/communications sought in the attached Rule 17(c) Subpoena. Pursuant to Rule 902(11), Fed. R. Evid., the undersigned counsel included a Certification of Domestic Records of Regularly Conducted Activity along with the Rule 17(c) Subpoenas, to be executed and returned with the documents.

AUSA Sullivan's response to the undersigned's request was as follows: "*the USAO will not comply w/ any of those requests, as we don't view them as anything that are required to be disclosed &/or provided to you under any discovery or _Brady_ rule.*" As a result of the Government's position, which is directly contradicted by the Eleventh Circuit's recent holding in _Doe No. 1 v. United States_, 749 F.3d 999 (11th Cir. 2014) and the Supreme Court's ruling in _Bowman Dairy Co. v. U.S._, 341 U.S. 214, 221 (1951), the undersigned counsel has been forced to file the instant motion for the issuance of the attached Rule 17(c) Subpoena to the USAO and request that this Court order the USAO to comply with the Subpoena prior to trial.

## I.   MEMORANDUM OF LAW

### A. <u>Rule 17(c) Subpoenas</u>

A criminal defendant has a constitutional right to obtain evidence bearing upon his guilt. _California v. Trombetta_, 467 U.S. 479, 485 (1984)("*under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence'")*. Similarly, a criminal defendant has a Sixth Amendment right

6



to process. *U.S. v. Beckford*, 964 F.Supp. 1010, 1016 (E.D. Va. 1977) ("*of course, Rule 17(c) reflects the command of the Sixth Amendment that the full power and processes of the courts are available to defendants in criminal cases to help defend themselves against the charges brought by the Government*").

"In a criminal case . . . '[the accused] has at stake interest of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction.' *In re Winship*, 397 U.S. 358, 363 (1970). This "interest of transcending value," of the accused to vindicate himself in a criminal case has been held to be paramount in a variety of matters. It has been held to trump the President of the United States' general claim of absolute presidential privilege, *See U.S. v. Nixon*, 418 U.S. 683, 703–16 (1974); a state's important interest in preserving the anonymity of juvenile offenders, *See Davis v. Alaska*, 415 U.S. 308, 318–21 (1974); and a patient's privacy interest in the confidentiality of medical records and the societal interest in encouraging the free flow of information between patient and psychotherapist, *See U.S. v. Lindstrom*, 698 F.2d 1154, 1166–67 (11th Cir. 1983). While these public interest concerns are of the highest magnitude, they, nevertheless, give way to the need of a criminal defendant to defend himself effectively in criminal proceedings." *U.S. v. Pelullo*, 14 F.3d 881, 893 (3rd Cir. 1994). *See also U.S. v. Libby*, 432 F.Supp.2d 26, 50 (D.D.C. 2006) (*a defendant's right to obtain relevant and admissible evidence overcomes assertion of reporter's privilege.*). "The attorney-client privilege . . . is inconsistent with the goal of discovering the truth at trial and, therefore, 'ought to be strictly construed within the narrowest possible limits consistent with the logic of its principle.'" *Rabin v. U.S.*, 896 F.2d 1267 (11th Cir. 1990), *vacated on other grounds, 904 F.2d 1498 (11th Cir. 1990)*.

QUINTERO BROCHE™

75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

Though not expressly stated in the Sixth Amendment, a defendant's right to present evidence in his defense is protected by the Constitution. *Rock v. Arkansas, 483 U.S. 44, 51 (1987)*. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky, 476 U.S. 683, 690 (1986)*.

**B.  Standard for Rule 17(c) Subpoenas as to Third Parties**

A court may order the production of materials pursuant to Rule 17(c) where the moving party establishes that the documents are material,[5] relevant,[6] and competent. *U.S. v. Robinson, 445 Fed.Appx. 238, 244 (11th Cir. 2011)*. The standard as stated in *Nixon*, requires "1) that the documents are evidentiary and relevant; 2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; 3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and 4) that the application is made in good faith and is not intended as a general 'fishing expedition.'" *U.S. v. Rajaratnam, 753 F.Supp.2d 317, 320 (S.D.N.Y. 2011) quoting Nixon, at 698*.[7]

---

[5] Evidence affecting credibility of a witness is material, when the "reliability of a given witness may well be determinative of guilt or innocence," *Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972)(citing Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 177 (1959))*.

[6] Pursuant to Rule 401, Fed. R. Evid., Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.

[7] As noted by Judge Holwell in *Rajaratnam*, some courts have articulated a different standard if the Rule 17(c) subpoena is directed to a third party (versus the Government): "in order to issue a Rule 17(c) subpoena duces tecum returnable prior to trial, a defendant 'need only show that the request is 1) reasonable, construed as material to the defense, and 2) not unduly oppressive for the producing party to respond.'" *Rajaratnam at 320 n. 1; See also United States v. Nosal, 291 F.R.D. 403 (N.D. Cal. 2013); United States v. Soliman, No. 06CR236A, 2009 WL 1531569 (W.D.N.Y. May 29, 2009)*. Although the Mr. Collazo asserts that the Rule 17(c) Subpoenas satisfy the *Nixon* standards, to the extent this Court finds otherwise, Mr. Collazo requests that the Court apply the lesser standards articulated in *Rajaratnam*, *Nosal* and *Soliman*.



QUINTERO BROCHE
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

Where evidence relevant to guilt or punishment is in a third party's possession and is too massive for the defendant to adequately review unless obtained prior to trial, pre–trial production through Rule 17(c) is necessary to preserve the defendant's constitutional right to obtain and effectively use such evidence at trial. *See* *U.S. v. Tomison, 969 F. Supp. 587, 593 (E.D. Cal. 1997)*; *See also* *U.S. v. Murray, 297 F.2d 812, 821 (2d Cir.) (interpreting* *Bowman* *as saying that Rule 17(c) permits pretrial production if it is necessary for the moving party to use the material as evidence at trial), cert. denied, 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962); U.S. v. Nixon, 418 U.S. 683, 698 (1974)(one of the chief innovations of Rule 17(c) is to expedite the trial by providing a means for pretrial inspection of subpoenaed materials).*

## C. Standard for Rule 17(c) Subpoenas as to the Government

A Rule 17(c) Subpoena to the Government must meet the standards set forth in *Nixon*, however certain exceptions and caveats have been carved out as it relates specifically to evidence in the Government's possession. As to documents in the Government's control, the Supreme Court has stated that "any document or other materials, admissible as evidence, obtained by the Government by solicitation or voluntarily from third persons is subject to subpoena." *See* *Bowman Dairy Co., 341 U.S. at 221(upholding portion of subpoena duces tecum to AUSA which read as follows: "all documents, books, papers and objects (except memoranda prepared by Government counsel, and documents or papers solicited by or volunteered to Government counsel which consist of narrative statements of persons or memoranda of interviews), obtained by Government counsel, in any manner other than by seizure or process, (a) in the course of the investigation by Grand Jury No. 8949 which resulted in the return of the indictment herein, and (b) in the course of the Government's preparation for the trial of this cause, if such books, papers, documents and objects,*

9

(a) have been presented to the Grand Jury; or (b) are to be offered as evidence on the trial of the defendants, or any of them, under said indictment").

Moreover, the Eleventh Circuit Court of Appeals in a recent decision found that correspondence documenting plea negotiations between the USAO and attorneys for defendant were not protected from disclosure to a third party, as long as they were not to be used directly against the alleged perpetrator. *See Doe No. 1 v. United States, 749 F.3d 999, 1008 (11th Cir. 2014)(correspondence documenting plea negotiations between the USAO and criminal defense attorneys for alleged perpetrator of federal sex crimes against minor victims were not protected from disclosure, in alleged victims' Crime Victims' Rights Act action challenging the USAO's execution of non-prosecution agreement with alleged perpetrator, by federal rule of evidence barring admission of plea negotiations; the alleged victims intended to admit the evidence of the plea negotiations to prove violations of the CVRA by the United States, not to be used against the alleged perpetrator).* The Court in *Doe No. 1* further found that the "disclosure of work-product materials to an adversary waives the work-product privilege." *Id.*

As discussed in detail below, the instant requests to compel compliance by MLB and the USAO with the attached Rule 17(c) Subpoena clearly satisfies the *Nixon* standards. Furthermore, the attached Rule 17(c) Subpoena to the USAO clearly falls within the purview of *Bowman* and *Doe No. 1*. Therefore, Mr. Collazo respectfully request that this Honorable Court issue the attached Rule 17(c) Subpoenas and issue an Order compelling MLB and the USAO to comply with the Subpoenas prior to trial.

## II.    SUBPOENA DUCES TECUM TO MLB

The documents sought in the attached Rule 17(c) Subpoena to MLB satisfy the standard in *Nixon*, as they are evidentiary and relevant, not otherwise procurable prior to trial, the failure to

10

produce such documents prior to trial would unreasonably delay the trial, and the request is made in good faith for the production of specific documents that are known to exist. *See Nixon, at 698.*

**1.  *Communications and/or documents between MLB and the State and/or Federal Government and their agencies (ie. DEA, DOH, USAO, etc).***

As early as 2009, MLB had approached DEA, and/or other law enforcement agencies, in connection to Bosch's distribution of PES to Manny Ramirez. As reported by Craig Calcaterra, then-MLB president, Bob Dupuy, said "we're aware of the investigation and our department of investigations is cooperating with the DEA."[8]

As per the Government's filings, MLB also approached DEA in September 2012 and informed them of suspected unlawful activity by two (2) individuals (ie. Anthony Bosch and Yuri Sucart) concerning PES and professional athletes.[9] However, the DEA case initiation report dated November 01, 2014, makes no mention of MLB DOI or the fact that information was provided by MLB to DEA.[10] Furthermore, the undersigned counsel has not received any documents relating to the approach of DEA by MLB in discovery. The Source of Information (SOI) and the CS mentioned in Paragraph twenty-two (22) of the March 21, 2014 Affidavit  cannot be one and the same, as per said Paragraph, the CS dealt with Sucart as the source for PES for some of the high school athletes receiving PES.[11]

On June 3, 2013 MLB and Bosch executed an agreement whereby Bosch would provide full and complete cooperation with MLB's investigation and all subsequent disciplinary proceedings against MLB players who received PES from Bosch, in exchange for certain concessions by

---

[8] *A copy of the November 10, 2014 article is attached hereto as Exhibit* 3.
[9] *See Exhibit 2, Page 10, Paragraph 20.*
[10] *A copy of the November 01, 2014 DEA report is attached hereto as Exhibit 4.*
[11] *See Exhibit 2, Page 11, Paragraph 22.*

QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

MLB.[12] Pursuant to the agreement, MLB shall advise the Department of Justice or any other Government agency of "the value and importance of Bosch's cooperation in its efforts to achieve the important public policy goal of eradicating PES from Professional baseball, and request that such agencies consider his cooperation with MLB." [13]

MLB has been successful in its disciplinary proceedings against the players implicated in the use of PES resulting in a record number of suspensions, in large part as a result of Bosch's cooperation. Thus, Bosch has presumably fulfilled his obligations pursuant to the June 3, 2013 agreement. However, as of the date of this filing, the undersigned counsel has yet to be provided any sort of communication and/or document from MLB to the USAO (and/or other Government agency) upholding its "obligation to Bosch" to advise the Government of his "valuable and important" cooperation, even though MLB was obligated to do so pursuant to the agreement. Bosch was scheduled for sentencing on December 18, 2014, but the sentencing has now been rescheduled for February 17, 2014. Furthermore, no documents and/or reports have been produced regarding MLB approaching DEA in September 2012, even though SA Grafenstein disclosed the same in the Title III Affidavit.

**2.  *Copies of any and all agreements, benefits, and/or payments conferred by MLB to any alleged co-conspirator, cooperating government witness, and/or their attorney/representative.***

The June 3, 2013 agreement provides the following benefits to Bosch: 1) MLB agreed to not serve Bosch with a copy of the Complaint filed against him in Miami-Dade, as well as preventing any of Bosch's family members (ie. Pedro Bosch, his father and medical director of Biogenesis,

---

[12] *A copy of the June 3, 2013 agreement is attached hereto as Exhibit 5.*

[13] Section 2(A) of the agreement states "if and when Bosch receives immunity from criminal prosecution, or otherwise resolves any criminal charges that may be filed against him by any state or federal law enforcement authority…" *See Exhibit 5, Page 2, Section 2(A).*



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

his brother, his daughter, etc) from being included in the civil litigation initiated by MLB;[14] 2) "MLB shall indemnify Bosch and hold him harmless to the fullest extent permitted by law against any civil claim brought by any Player";[15] 3) MLB "will pay for reasonably appropriate security services to be provided to him and such immediate family members; provided however, that such payment will not continue beyond June 3, 2014, and the cost of such security shall not exceed $2,400per day…Bosch shall select the firm to provide the services described in this section";[16] [17] 4) "MLB shall advance and pay on behalf of Bosch the reasonable attorney's fees he incurs in connection with the performance of his duties and obligations under this Agreement";[18] [19] and 5) "MLB shall reimburse Bosch, his attorneys, and security personnel for their travel expenses incurred in connection the performance of his duties under this Agreement in such amount as MLB shall deem reasonable in its discretion."[20]

The June 3, 2013 agreement explicitly states "other than as expressly provided in this section MLB shall provide no payment indemnification, advance, guarantee of payment, compensation or anything else of value to Bosch."[21] However, the undersigned's investigation has revealed information tending to show that MLB has directly and/or indirectly conferred additional benefits

---

[14] *See Exhibit 5, Page 1, Section 1.*

[15] *See Exhibit 5, Page 5, Section 5(A).*

[16] *See Exhibit 5, Page 5, Section 5(B).*

[17] Over the course of this agreement, MLB would pay up to a maximum of $873,600.00 for Bosch's bodyguard, to be chosen by Bosch. Based on information provided by witnesses, Bosch selected Raj Badree, owner of Professional Protection, Inc., to be paid by MLB for Bosch's security needs. Noticeably, discovery in this case suggests that Badree was a long-time patient of Bosch and purportedly received a substantial amount of PES from Bosch throughout his involvement with Bosch..

[18] *See Exhibit 5, Page 5, Section 5(C).*

[19] Pursuant to a March 27, 2014 agreement between MLB and Bosch, "Bosch has requested that MLB pay to Bosch's Attorneys on his behalf certain reasonable attorneys' fees and expenses" as a result of any criminal proceeding "and MLB desires to comply with that request." *A copy of the March 27, 2014 agreement is attached hereto as Exhibit 6.* The hourly rate for Bosch's attorney, as set forth in the agreement, range from $750 per hour for Guy A. Lewis to $500 for Susy Ribero-Ayala.

[20] *See Exhibit 5, Page 6, Section 5(D).*

[21] *See Exhibit 5, Page 5, Section 5.*



QUINTERO BROCHE
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

on Bosch, well beyond those enumerated above. According to Bosch's attorney, Susy Ribero-Ayala's testimony at Alex Rodriguez' arbitration hearing on October 16, 2013, MLB paid the legal fees for Bosch's attorneys;[22] Mrs. Ribero-Ayala's attorney at the arbitration hearing, Samuel J. Rabin; as well as a publicist for Bosch. [23] [24]

According to Rob Manfred's testimony at Mr. Rodriguez' arbitration hearing, at the initial meeting with Bosch MLB told him "*we needed him to testify, and that that was going to be the core of the cooperation agreement, and that therefore we could not pay him, and that was just off the table from the beginning, and that we couldn't, just couldn't do that*."[25] The initial meeting with Bosch at Scotty's landing, a restaurant in Miami, took place in late March/April 2013. According to Claudia Cosculluela, who was Bosch's girlfriend during the time he was operating Biogenesis, when Bosch and Cosculluela met the following night after Bosch met with MLB for the first time, Bosch stated that he "*was going to make millions and for her to quit her job.*"[26]

Furthermore, there are legitimate concerns that MLB either directly and/or indirectly engineered their agreement with Bosch to allow for kickbacks to Bosch, by and through his attorneys and/or bodyguard. On or about February 25, 2013, in Bosch's child support case relating to his ex-wife Aliette Bosch, Case No.: 09-0031098, the court made the following findings "[Bosch] testified that he has not fully complied with his child support because he is self-employed

---

[22] Including Mrs. Ribero-Ayala, Julio Ayala, who is Mrs. Ribero-Ayala's husband and high school friend of Bosch, and Sylvia Pinera-Vazquez. In Bosch's criminal case he is also represented by Guy A. Lewis, of Lewis Tein, P.L.

[23] *A copy of Mrs. Ribero-Ayala's arbitration testimony is attached hereto as Exhibit 7.*

[24] Neither the June 3, 2013 agreement nor the March 23, 2014 agreement state that MLB will pay for a publicist. At the arbitration hearing, Mr. Manfred stated "my understanding is that the lawyers retained a PR person to help prepare Mr. Bosch for his testimony and we reimbursed for the cost of that, as part of the legal fees." *See Exhibit 8, Page 1929, Line 5-8.*

[25] *A copy of the relevant portions of Mr. Manfred's arbitration testimony is attached hereto as Exhibit 8.*

[26] Page 10, Paragraph 31 of the Report titled "Interview of Claudia Cosculluela on December 18, 2013, in Miami, FL."



working as a bio-chemist…[Bosch] testified he has been offered consulting jobs to begin in the next thirty (30) days."[27] On or about May 30, 2013 the court in Bosch's family case made the following finding of fact, "counsel proffered that his client [Bosch] is going to start working with the Major League Baseball Commission starting Monday."[28] Lastly, as it relates to Bosch's family case, as of the date of the June 3, 2013 agreement with MLB, Bosch's attorney, Mrs. Ribero-Ayala, and Bosch's bodyguard and longtime acquaintance, Raj Badree (the owner of Professional Protection, Inc.) have made child support payments on behalf of Bosch in the amount of $30,549.00.[29] On or about December 13, 2013, Mrs. Ribero-Ayala made a payment for Bosch's child support obligations from her law firm's "Escrow Account" in the amount of $15,000.00.[30] On or about April 10, 2014, a payment was made for Bosch's child support obligation via a cashier's check from a TD Bank account belonging to "Professional Protection, Inc.," which is presumably providing security services, paid by MLB, to Bosch. On or about May 12, 2014, a purge in Bosch's family court case was satisfied via a cashier's check from an unidentified account.[31]

The June 3, 2013 agreement specifies that notice to Bosch must be made directly to Julio J. Ayala, Bosch's longtime friend and Mrs. Ribero-Ayala's husband. However, Mr. Ayala has not filed a notice of appearance on behalf of Bosch in any matter (ie. criminal, civil, the MLB arbitration hearing, etc). Furthermore, Mr. Ayala is not even referenced in the fees portion of the March 23, 2014 agreement. Nonetheless, as of October 16, 2013, Mr. Ayala had received "at least

---

[27] *A copy of the court's April 01, 2013 Order is attached hereto as Exhibit 9.*

[28] *A copy of the court's June 24, 2013 Order is attached hereto as Exhibit 10.*

[29] *Copies of the checks evidencing the subject payments are attached hereto as Composite Exhibit 11.*

[30] The check memo states "Replacement of Amex Payment." Upon information and belief, this check was a replacement for a failed credit card transaction Mrs. Ribero-Ayala had previously made for Bosch's child support obligations.

[31] A receipt was issued for this unidentified cashier's check, identifying Mrs. Ribero-Ayala as the drawer/payor.



the same amount" of payment for legal services as Mrs. Ribero-Ayala, for "representing" Bosch.[32] Based on Mrs. Ribero-Ayala's testimony and a copy of her bank records, as of October 7, 2014, she and her husband, had received at least $350,000 to $450,000 each for the representation of Bosch.[33] These figures, totaling approximately $1,000,000.00 in fees between the Ayalas, were purportedly paid by MLB for Bosch's "representation" prior to any criminal charges being filed against Bosch or Bosch cooperating with the USAO.

The instant request goes beyond MLB's relationship with Bosch and his lawyers. The discovery provided reveals that MLB's willingness to pay for witnesses' cooperation is not limited solely to Bosch. On or about August 22, 2013, Dan Halem signed an agreement with Ricardo Martinez, who was the Manager and CFO for Biogenesis, promising Mr. Martinez similar benefits to those conferred upon Bosch in the June 3, 2013 agreement, in exchange for his cooperation against players involved in the use/distribution of PES;[34] MLB also obtained an affidavit from Ms. Cosculluela after numerous extravagant outings to luxurious restaurants and bars as well as the payment of monies. [35] Ms. Cosculluela subsequently admitted to DEA that she did not read or author the affidavit that MLB had her execute. Moreover, according to Gary L. Jones September 30, 2013 Affidavit, MLB was aware that the documents being sold to them were stolen from Biogenesis and/or Porter Fischer, and still purchased the first set of documents for $125,000 in cash, and the second set of documents for $25,000.[36]

---

[32] *See Exhibit 7, Page 1618.*

[33] *A copy of Mrs. Ribero-Ayala's bank account showing payment from MLB is attached hereto as Exhibit 12.*

[34] *A copy the agreement between MLB and Ricardo Martinez is attached hereto as Exhibit 13.*

[35] The actions of MLB as it relates to Ms. Cosculluela are so extensive that the undersigned is attaching the relevant pages of Ms. Cosculluela's December 18, 2013 interview with DEA. *A copy of the relevant portion of the report titled "Interview of Claudia Cosculluela on December 18, 2013, in Miami, FL" is attached hereto as Exhibit 14.*

[36] *A copy of Gary L. Jones' affidavit is attached hereto as Exhibit 15.*



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

The following are relevant excerpts of DEA-6 Reports of Investigations further evidencing

MLB's payment of monies to witnesses involved in the present cause: [37]

> Velazquez told the CS that Bosch received $250,000 from Major League Baseball (MLB) and Velazquez was offered the same amount of money but refused.[38]

> Velazquez told the CS he wanted to retrieve an e-mail the CS was in possession of. The e-mail was from MLB to Xavier Romero. In the e-mail, MLB, stated 'when the dust settles, we'll get together and have lunch.' The letter was referencing Romero's cooperation with MLB.[39]

> Delgado stated that he was approached by MLB investigators several months ago. Delgado gave bottle [of substance provided by Bosch] to the MLB investigators and received $1,000 in return. Delgado reported that he met with MLB investigators on two occasions, both meetings having occurred at the Flanagan's Restaurant in Miami. Delgado further reported that he signed a confidentiality agreement with the MLB investigators.[40]

> Bosch advised that MLB had been trying to track him down and get to him through other people he was associated with. Bosch also advised that per MLB, Velazquez was being paid by MLB for information for a brief period of time… during the arbitration hearing an MLB employee on the arbitration team had spoken aloud during a meeting that Velazquez had been paid for approximately two (2) to three (3) months for services and information prior to Bosch cooperating with MLB. [41]

> The CS told Velazquez he/she saw Velazquez' photo all over the place (in the media). Velazquez said it was Anthony Bosch's fault. Velazquez said Bosch made up stories so Bosch could get paid by MLB. Velazquez said Bosch was paid 1 million dollars by MLB and Bosch's attorney, Susy Ribero-Ayala, received 2.5 million dollars.[42]

---

[37] Due to their sheer size, the undersigned counsel is not attaching complete copies of the relevant DEA-6s. Furthermore, the undersigned counsel is only attaching redacted copies of DEA-6s to avoid the disclosure of sensitive information. Nonetheless, at the Court's pleasure the undersigned counsel would be willing to file said reports under seal or in open court if so needed.

[38] Page 5, Paragraph 23 of Report titled "CS Debriefing of [blank] on August 22, 2013, in Miami, FL with GS Participation."

[39] Page 4, Paragraph 19 of Report titled "CS Debriefing of [blank] on January 30, 2014, in Miami, FL."

[40] Page 6, Paragraph 41 of Report titled "Interview of Manuel Delgado on 01-06-2014."

[41] Page 5, Paragraph 9 and Page 10, Paragraph 19 of Report titled "Interview of Anthony Bosch on April 9, 2014 at the Miami Field Division (Interview #2)."

[42] Page 1, Paragraph 2 of Report titled "Synopsis of Non-Drug Exhibit N-294 (Meeting between [blank] and Jorge Velazquez on February 13, 2014, in Pembroke Pines, FL.)"



QUINTERO BROCHE™

75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446–0303 • Fax: (305) 446–4503

[Porter] Fischer described several meetings with MLB representatives Ed Maldonado, Tom Riley, and Dan Mullin, who offered him a job and up to $125,000 for the client files from Biogenesis.[43]

Halem [MLB's VP of Labor Relations, who executed the two (2) agreements with Bosch] said MLB bought a 'batch of documents' that were on 4 flash drives from [Gary] Jones for $100,000…Several weeks later, Jones contacted Mullen again and offered more documents…MLB made the second purchase of documents from Jones on April 16th for $25,000.[44]

The discovery reviewed to date demonstrates a clear pattern by MLB of paying witnesses for their testimony and/or cooperation. Furthermore, some of the statements by said witnesses show that MLB either directly or indirectly influenced their testimony/statements. Therefore, proof of the benefits conferred upon the witnesses in this cause goes directly to the heart of the charges against Mr. Collazo, and implicates the Confrontation Clause of the Sixth Amendment. Furthermore, the information stated above gives rise to legitimate concerns that MLB either directly and/or indirectly engineered their agreement with Bosch to allow for kickbacks to Bosch, by and through his attorney(s) and/or bodyguard. Information pertaining to the foregoing would clearly be material to Mr. Collazo's defenses in this case.

**3.  *Copies of any and all documents, records, lab reports, investigative reports, correspondences, and/or communications relating to the 2009 investigation of Manuel Ramirez, Anthony Bosch and/or Pedro Bosch in relation with the distribution and/or use of Performance Enhancing Substances.***

In his interview with DEA agents on May 16, 2014, Bosch stated that he was asked by Scott Boras, the agent for Manny Ramirez, to create a false medical file to justify Mr. Ramirez' positive test and prevent a suspension by MLB.[45] Bosch created the file for Mr. Ramirez, even though

---

[43] Entry in Boca Raton Police Department file of Summary of conversation between Officer T.M. Payne, of the Boca Raton Police Department, and Porter Fischer on April 1, 2013.

[44] Entry in Boca Raton Police Department file of Summary of conversation between Officer T.M. Payne, of the Boca Raton Police Department, and Dan Halem on November 05, 2013.

[45] *A copy of the relevant portion of DEA report for the May 16, 2014 interview with Anthony Bosch is attached hereto as Exhibit 16.*

18



QUINTERO BROCHE™

75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

Bosch stated that Bosch "never kept charts on the athletes."[46] In a subsequent meeting with DEA agents, Bosch expanded on the creation of a patient file for Mr. Ramirez. Bosch stated that he along with another doctor "created a fictitious medical chart for MLB that would show that Manny Ramirez was using HCG, not testosterone."[47]

    As the charges against Mr. Collazo relate to the distribution of Schedule III Controlled Substances, purportedly dispensed by Bosch, the proof of what was given to patients, such as Mr. Collazo, rests largely on the contents of their patient files. Based on the relevance of the medical charts and the weight the jury will attribute to them, evidence that Bosch, who allegedly authored the charts at issue herein, has previously falsified records is not only relevant but likely exculpatory, and would constitute *Brady* and/or *Giglio* evidence. Therefore, information pertaining to the Manny Ramirez' positive test and suspension, which would presumably include the false medical file, is relevant as Bosch has admitted that he was asked to, and in fact did, create a false medical file.

    **4.**  ***Copies of any and all memorandums, proffers, statements, interview notes, and/or transcripts in connection with meetings with Anthony Bosch, Carlos Acevedo, and/or any other witness (including their attorney/representative) involved in the investigation pertaining to the two (2) aforementioned individuals, Biogenesis of America, LLC., Biokem, LLC., and/or Lazaro "Lazer" Collazo.***

    Pursuant to the June 03, 2013 agreement with MLB, Bosch was required to "participate in a proffer with representatives of MLB at which Bosch or his attorney shall fully and truthfully answer any questions…The parties agree and stipulate that MLB shall be entitled to take notes during the proffer."[48] Furthermore, Mrs. Ribero-Ayala's testimony shows that Bosch has met at

---

[46] *See Exhibit 16, Page 11, Paragraph 62.*
[47] *A copy of the relevant portions of the May 19, 2014 Interview with Anthony Bosch is attached hereto as Exhibit 17.*
[48] *See Exhibit 5, Page 2, Section 2(A).*



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

least "six to eight" times with MLB, and a "significant number of communications by phone and e-mails [were] exchanged.[49] During his May 16, 2014 statement to DEA, Bosch advised the Government "that there were numerous practice sessions" with MLB prior to the arbitration hearing.[50] Moreover, during the October 16, 2014 hearing on Bosch's motion to reinstate bond, counsel for Bosch, stated "*this is actually a case that started with Mr. Bosch being linked to professional athletes and began cooperating with the Major League Baseball authorities. In that case, he met multiple times prior to coming into the case.*"[51] Furthermore, at least one other witness, Mr. Martinez, has been interviewed at length by MLB.[52]

Based on the documents that MLB provided to the Government, which in turn were disclosed during discovery, Mr. Collazo was considered a person of interest by MLB[53] and on more than one occasion witnesses were asked specifically about Mr. Collazo.[54] Presumably, some of these witnesses, which were previously interviewed by MLB (such as Bosch), will be testifying in the Government's case against Mr. Collazo, or provided exculpatory information regarding Mr. Collazo to MLB.

The discovery reviewed shows that numerous witnesses have made conflicting statements involving the accusations against Mr. Collazo. Based on this pattern of inconsistency, the undersigned counsel has reason to believe that witnesses would have made statements directly

---

[49] *See Exhibit 7, Page 1600-01.*
[50] *See Exhibit 17, Page 2, Paragraph 3.*
[51] *A copy of the transcript of the October 16, 2014 hearing on Bosch's Motion for Bond in Case No.: 14-20555-CR-Gayles is attached hereto as Exhibit 18.*
[52] According to Mr. Manfred's testimony, "Ricky Martinez, we interviewed, talked to Mr. Martinez as part of the investigation." *See Exhibit 8, Page 1907, Line 1-5.*.
[53] After filing their Complaint against Bosch and his co-defendants, MLB sought to depose Mr. Collazo and did in fact depose him, even though he was not an interested party in the lawsuit.
[54] Mr. Manfred has previously testified that MLB "had extensive investigatory activity related to other Biogenesis employees that was corroborative of other evidence that Mr. Bosch provided firsthand." *See Exhibit 8, Page 1906, Line 17-23.*



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

related to Mr. Collazo and/or the charges at issue in the Indictment. Specifically, as of the date of this filing, no reports and/or proffers from Bosch to MLB have been provided in discovery even though such documents are known to exist.[55]

**5.** ***Copies of any and all lists, correspondences, and/or documents by Anthony Bosch (and/or his attorney/representative) to MLB identifying and describing with particularity any documents destroyed, amended, sold or otherwise made unavailable prior to the effective date of the June 3, 2013 agreement between Bosch and MLB.***

Pursuant to the June 3, 2013 agreement, Bosch was required to "identify an describe with particularity to MLB any document destroyed, altered, amended, sold, or otherwise transferred or made unavailable prior to the effective date of this Agreement. Bosch shall use his best efforts to identify other persons who may possess, control, or have access to any document, and to secure the production to MLB of any such Document in the possession, custody, or control of such persons."[56]

As stated previously, the integrity and reliability of the medical records at issue in this case is critical to Mr. Collazo's defense. These medical records have exchanged hands numerous times, some have been destroyed, as admitted to by certain witnesses, and some are missing. For instance one of the documents in the Boca Police Department file, titled "Forensic Analysis Results Summary for USB Keys Provided by Gary Jones" regarding Bosch's composition notebooks states "it appears that someone modified the second two notebooks (2011 and 2012) on March 19, 2013

---

[55] The litigation between MLB and Bosch related to Biogenesis is over. This lawsuit was dismissed by MLB and therefore, MLB has no viable claim of litigation privilege regarding these documents, reports, proffers, etc.
[56] *See Exhibit 5, Page 3, Section 2(B)(2).*

QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446–0303 • Fax: (305) 446–4503

(just prior to the sale). We cannot tell what the alterations were."[57] [58] [59] There are numerous other references in the DEA reports provided, as to the destruction, modification, and/or alteration of records at issue in this cause.

As it pertains to MLB, according to the June 3, 2013 agreement, Bosch would have provided a list to MLB detailing what documents were destroyed, amended, sold, or otherwise unavailable. However, no such list and/or document has been turned over to the undersigned counsel. Based on the foregoing, such a list is clearly relevant and material, as it goes directly to the reliability of the evidence in this case as well as the Government's proof of guilt against Mr. Collazo. Therefore, fundamental fairness and due process dictated that this evidence be subject to pretrial disclosure to Mr. Collazo.

### III.    Subpoena Duces Tecum to USAO

The documents sought via the attached Rule 17(c) Subpoena to the USAO satisfy *Nixon*, and fall squarely within the holdings set forth in *Bowman Dairy Co.*, and *Doe No. 1*. Mainly, the request to the USAO seeks the production of documents obtained by the Government by solicitation or voluntarily from third persons and/or entities. *See Bowman Dairy Co., 341 U.S. at 221*. Moreover, the communications sought are not protected from disclosure as the undersigned counsel intends to use them against the Government and not against the individuals involved, in any other proceedings. *See Doe No. 1, 749 F.3d at 1008.*

*1.  Copies of any and all communications between the USAO and the alleged co-conspirators in Mr. Collazo's case, including any communications with their attorney(s).*

---

[57] *A copy of the document titled "Forensic Analysis Results Summary for USB Keys Provided by Gary Jones" is attached hereto as Exhibit 19.*

[58] The USB Keys provided by Gary Jones were purchased by MLB.

[59] Upon information and belief, MLB filed their civil lawsuit, against Bosch and others, approximately three (3) days after these notebooks were modified, on March 22, 2013, using at least some of the purchased information contained in the altered notebooks.



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

Pursuant to the Eleventh Circuit Court's decision in *Doe No. 1*, correspondence documenting plea negotiations between the USAO and attorneys for a criminal defendant are not protected from disclosure, where they are to be used against the Government. *Doe No. 1, 749 F.3d at 1008.* Here, the Government's handling of the investigation resulting in Mr. Collazo's indictment forms a crucial part of the Defense's theory of the case at trial.

For instance, at the hearing on Bosch's Unopposed Motion to Reinstate Bond, after having his bond revoked for testing positive for cocaine twice, AUSA Sullivan stated "*the other interest that the Government has is that defendants who enter into plea agreements with the Government faithfully comply with the conditions of those plea agreements. On that score, this defendant has done that. We have no reason to complain or criticize anything that Mr. Bosch has done in faithfully meeting with us timely numerous times.*"[60]

Noticeably, at the time of AUSA Sullivan's statements, Bosch had tested positive for cocaine twice (both of which occurred after executing the plea agreement), and Bosch had informed the Probation Officer that he had been using cocaine every day for four (4) years. Therefore, Bosch would have been continually using cocaine while being debriefed by the USAO and DEA, and yet denied use of the same, or denied being under the influence of any illegal drug, when asked about drug use at the outset of a majority of his meetings with the Government. However, Bosch's Plea Agreement with the Government requires that Bosch refrain from committing "any misconduct after entering into this plea agreement, including but not limited to committing a state or federal offense….or violating any term of release.[61] Therefore, based on Bosch's own admission, he violated the plea agreement, yet no negative action was taken by the USAO. Instead the positive

---

[60] *See Exhibit 18, Page 10, Line 4-10.*
[61] *See Plea Agreement for Anthony P. Bosch, Case No.: 14-20555-CR-Gayles, Page 3, Paragraph 6.*

23



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

drug tests by Bosch were not brought to the court's attention immediately, and the court had to hold a Show Cause Hearing as to why Bosch's bond should not be revoked. Notwithstanding, Bosch's violation of the plea agreement, the USAO did not oppose his motion for reinstatement of bond, and instead implicitly supported his request for bond, via statements to the court.[62]

Furthermore, on April 21, 2014, SA Grafenstein spoke with Aliette Bosch, who "inquired if SA Grafenstein knew the whereabouts of her ex-husband Anthony Bosch as Bosch was delinquent in his child support payments…SA Grafenstein advised that DEA did not know the whereabouts of Anthony Bosch[63]…she did not think it was fair that Bosch could circumvent the law for as long as he has and not pay any consequences for his actions"…SA Grafenstein was advised "to have no further contact with Aliette Bosch."[64] Subsequently, in Bosch's family court case a Writ of Bodily Attachment was entered on April 23, 2014, and recorded on April 28, 2014, for Bosch's repeated failure to pay child support. The Writ required a purge in the amount of $8,000.[65] The Writ of Bodily Attachment is a Court Order that mandates that all Sheriffs and other authorized Law Enforcement personnel take Bosch into custody immediately.[66] On April 28, 2014, DEA agents, including SA Cheryl Ortiz, and AUSA Motiani were scheduled to meet with Bosch and his attorneys. At said meeting, Mrs. Ribero-Ayala notified the parties of the Writ of Bodily Attachment and said "Bosch will not continue any further interview(s) until his legal issues are resolved."[67] At this meeting, the DEA agents disregarded the Writ and did not take Bosch into

---

[62] *See Exhibit 19.*

[63] At this time, DEA had met with Bosch at least four (4) times and had inquired as to his residence and whereabouts.

[64] *A copy of report titled "Telephone Conversation with Aliette Bosch on April 21, 2014" is attached hereto as Exhibit 20.*

[65] *A copy of the April 23, 2014 Order and the Writ of Bodily Attachment are attached hereto as Exhibit 21.*

[66] *See Exhibit 19.*

[67] *A copy of the report titled "Notice of Writ for Bodily Attachment issued for Anthony Bosch on April 24, 2014" is attached hereto as Exhibit 22.*



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

custody. Coincidently, Bosch's purge was paid via a cashier's check from Mrs. Ribero-Ayala's account on May 12, 2014.[68] As a result of Mrs. Ribero-Ayala's payment, the Writ was quashed and Bosch resumed meeting with the Government on May 16, 2014, a mere four (4) days after payment was made.

Therefore, based on the Government's representations to the court on October 16, 2014, the circumstances surrounding Bosch's cocaine abuse, and the failure to arrest Bosch after the Writ of Bodily Attachment was issued, it appears quite evident that Bosch is and has received further concessions and/or benefits than those set forth in his plea agreement.

In addition to the obvious concessions/benefits afforded by the Government to Bosch, the evidence in this case also demonstrates that Carlos Acevedo, Bosch's business partner, who is an alleged co-conspirator in this case and cooperating Government witness, also received considerable concessions and/or benefits from the Government beyond the express terms set forth in his Plea Agreement. Acevedo was charged via Information in Case No.: 14-20556-CR-Gayles with two (2) counts of conspiring to distribute controlled substances in violation of 21 USC 841(a)(1).[69] The controlled substances involved in Acevedo's charges were testosterone and 3,4-Methylenedioxyl-N-Methylcathinone Hyrdrochloride (commonly referred to as "Methylone" and/or "Molly").

The evidence in this case reveals that Acevedo has been cooperating with the Government in its investigation herein since on or about June 7, 2013, after the DEA executed a search warrant of his home and seized various items of contraband, including a firearm.[70] Review of the discovery

---

[68] *See Composite Exhibit 11.*

[69] Carlos Acevedo has a prior felony conviction in the State of Florida for trafficking in cannabis.

[70] The relevant DEA-6 reports do not disclose the CS identity, however upon information and believe, the undersigned counsel has determined that the CS referenced therein is Carlos Acevedo.



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

in this case, including numerous DEA-6s involving Acevedo, confirm that Acevedo's charges stem from his distribution of PES as part of a partnership with Bosch and others, as well as his distribution of "Molly" pills (up to 1,000 at a time) to various individuals.

A review of the discovery makes it readily apparent that in exchange for his cooperation in this case, the Government afforded Acevedo the benefit of a Plea Agreement that limited his considerable exposure. Specifically, Acevedo's Plea Agreement contains provisions limiting the amounts of the drugs involved (or calculating the amounts using equivalency ratios favorable to Acevedo), and which effectually forego various otherwise applicable specific offense characteristics and aggravating role adjustments.

However, a review of the DEA-6s of interviews or other events involving Acevedo confirm various other concessions and/or benefits conveyed upon Acevedo by the Government that go far beyond the confines of his generous Plea Agreement.

Specifically, the Government apparently chose not to prosecute Acevedo for illegally possessing a firearm despite being a convicted felon, a violation of 18 USC 922 that would have subjected Acevedo to at least a five (5) year minimum mandatory prison sentence. The subject firearm was found by DEA in Acevedo's bedroom night table on June 7, 2013 during the execution of a search warrant at Acevedo's home. This firearm was seized by DEA and transferred to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) which concluded that the firearm in question was manufactured in New Hampshire and that its possession in Florida meant that it had traveled in interstate commerce. The discovery provided to date includes various DEA-6s and other documents establishing that either by Acevedo's own admission, or by statements of third parties, the firearm in question belonged to Acevedo; that Acevedo used his home to store and distribute controlled substances; and, that Acevedo had never applied for, nor received a pardon

26

restoring Acevedo's right to possess a firearm. Despite this seemingly overwhelming evidence that Acevedo, a convicted felon, was illegally in possession of a firearm (acquired via interstate commerce) serving to further his distribution of illegal drugs from his home, the Government never charged Acevedo in connection with this firearm. However, there can be little doubt that this concession by the Government was addressed in communications at some point during Acevedo's cooperation and/or plea negotiations.

In addition, two (2) DEA-6s involving interviews of Acevedo on February 4, 2014 and February 6, 2014, respectively, confirm that from the date Acevedo began to cooperate with the Government (June 2013) until at least February 2014, Acevedo was regularly ingesting illegal drugs and engaging in various other drug related crimes.[71] Specifically, in his February 4, 2014 interview/debriefing with DEA, Acevedo was asked by DEA regarding his personal drug use from the date he began to cooperate with the Government and he advised that he had been "ingesting "Mollies" since July 201[3], approximately 1 to 2 times a week." In the same interview, Acevedo was asked by DEA agents when he had last ingested Mollies and he responded, "February 1, 2014," which was merely three days prior to the subject interview.

More troublesome however, during a follow up interview of Acevedo on February 6, 2014, an interview in which Acevedo was advised that DEA and the U.S. Attorney's office had "a zero tolerance policy on drug use," Acevedo was asked regarding what illegal activity he had been involved in, if any, since July 30, 2013. As per the February 6, 2014 DEA-6, Acevedo admitted to ingesting Mollies, purchasing 15 to 20 Molly pills in September 2013, selling Molly pills to Carlos Ruiz (co-defendant charged in Case No.: 14-20551-CR-Moreno), and injecting a client with

---

[71] *A copy of the Fenruary 4, 2014 report and the February 6, 2014 report is attached hereto as Exhibit 23 and 24, respectively.*



QUINTERO BROCHE
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

testosterone from a testosterone bottle that DEA had failed to seize during the execution of the search warrant at Acevedo's home on June 7, 2013.

Notwithstanding these admissions of illegal drug activity, the Government continued to enlist Acevedo's cooperation after February 2014, interviewing and/or meeting with Acevedo at least five (5) more times between February and June 2014. As of the date of this Motion, the Government also has not initiated any criminal charges against Acevedo in relation to his admitted illegal drug activity from June/July 2013 through February 2014. It is important to note that all of this illegal conduct admitted to by Acevedo in February 2014 occurred while Acevedo was under an agreement with DEA and the Government to refrain from any illegal activity. This illegal conduct was also subsequent to the time period encompassing the charges filed by the Government against Acevedo (and addressed in his Plea Agreement). Therefore, the Government's decision not to terminate his cooperation in February 2014, nor prosecute Acevedo for his admitted criminal activity while assisting the Government, are obvious additional benefits (beyond Acevedo's Plea Agreement) conferred by the Government upon Acevedo. Fundamental fairness dictates that Mr. Collazo be afforded pretrial disclosure of any communications related to these benefits as they are not only relevant to this case but material to Mr. Collazo's ability to adequately prepare and present his defense.

Based on the foregoing, Mr. Collazo submits that any communications regarding plea negotiations with the alleged co-conspirators, including Bosch and Acevedo, meet the standards set forth by *Nixon* and *Doe No. 1*, and should therefore be subject to pretrial disclosure by the Government.

2. ***Copies of any and all communications and/or agreements between the USAO and any individual given immunity in connection with any investigation concerning Biogenesis***

28



***and/or the distribution of PES by Acevedo and/or Bosch. This request includes any non-prosecution agreement between the USAO and any of the above implicated individuals.***

The undersigned counsel is aware of at least twenty (20) individuals that were given direct use immunity for any statements made to the DEA during their investigation. Of these twenty-or-so individuals, approximately nine (9) of them are professional baseball players that were involved in MLB's investigation and subsequent disciplinary proceedings. There is reason to believe, based on media reports, that the individuals given immunity in this case have received certain benefits and/or incentives from the USAO for their cooperation, which has thus far not been disclosed. For instance, Alexander Rodriguez was given direct use immunity, via a *Kastigar* letter executed on January 29, 2014.[72] Mr. Rodriguez met and provided DEA agents with information relating to Bosch and his alleged coconspirators. Subsequently, the DEA and the USAO have interviewed and met with witnesses who have provided evidence that Mr. Rodriguez may have lied and may have allegedly facilitated Bosch's illegal distribution of Schedule III controlled substances after the Miami New Times Story broke in January 2013.

Notwithstanding, the USAO has taken no action against Mr. Rodriguez instead making it known that they intend to rely on his testimony at trial. Even though, Mr. Rodriguez was only given direct use immunity, his lawyer, Joseph Tacopina, has made public statements tending to show that Mr. Rodriguez' agreement with the government extends well beyond a simple *Kastigar* letter and actually involves promises of non-prosecution by the Government. In a November 14, 2014, New York Magazine article titled "A-Rod's Lawyer Declares Victory" Mr. Tacopina is quoted as saying "He didn't get indicted…It's over. Game. Set. Match."[73]

---

[72] *A copy of the Alexander Rodriguez Kastigar letter is attached hereto as Exhibit 25.*
[73] *A copy of the November 14, 2014 article is attached hereto as Exhibit 26.*



QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

Mr. Tacopina, who served as a prosecutor prior to practicing as a criminal defense attorney, would be aware that the immunity agreement conveyed to Mr. Rodriguez would not bar prosecution against his client under certain circumstances, such as for providing false information or information derived from other investigations/witnesses. Therefore, based on Mr. Tacopina's statements to the press and the language of the Alex Rodriguez *Kastigar* letter, there is information and belief that another, yet undisclosed non-prosecution agreement exists (or communications to that effect) with Mr. Rodriguez and/or his counsel, as well as with other Government witnesses. Therefore, such agreements and/or communications would be subject to disclosure pursuant to *Doe No. 1* and would constitute *Giglio*/*Napue* evidence that is subject to disclosure.

**3.** ***Any and all documents, reports, memorandums, and/or communications turned over (either by solicitation or voluntarily) to the USAO from a third person and/or entity in connection with the investigation into Biogenesis, including but not limited to Anthony Bosch, Carlos Acevedo and/or Lazaro Collazo.***

As stated previously, the initial investigation resulting in Mr. Collazo's Indictment was initiated, in large part, by MLB. Furthermore, a large portion of the documents turned over during discovery in this matter are documents that have been turned over by third parties to the USAO, as well as the DEA and other departments. However, there is reason to believe that there are certain documents which were provided by third parties to the USAO, which have yet to be turned over. For instance, as stated previously, Bosch was to have provided MLB with a detailed list of the documents that were destroyed, altered, etc., however, no such list has been provided in discovery. Furthermore, the documents sought by this subpoena have been found to be subject to a Rule 17(c) subpoena by the United States Supreme Court, therefore, the USAO should be compelled to comply with the attached Rule 17(c) subpoena prior to trial and disclose all documents received from third parties. *See Bowman Dairy Co., 341 U.S. at 221.*

30

QUINTERO BROCHE
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

## IV.   **CONCLUSION**

The attached Rule 17(c) Subpoenas seek relevant and admissible documents directly germane to Mr. Collazo's defense of the Government's conspiracy and substantive charges that form the basis of the Indictment in this cause. Furthermore, the requests in the attached Rule 17(c) Subpoenas have been surgically crafted to obtain specific documents which are known to exist or are reasonably believed to exist, as well as being material to Mr. Collazo's defense.  None of the documents are procurable except via the Rule 17(c) Subpoenas against the subject parties. Importantly, the failure to obtain copies of the requested documents for inspection prior to trial will result in a delay of the trial because the documents will require significant review and analysis in order to incorporate the information contained therein into the defense strategy and have viable opportunity to make use of this evidence. In addition, the documents sought pertain to time periods that fall well within the time period at issue in the Indictment, as the requests are limited from 2009 to the Present. The Subpoenas thus comply with the requirements enunciated in *Nixon*, *Bowman*, and *Doe No. 1*.

Accordingly, Mr. Collazo, by and through the undersigned counsel, seeks an order from this Court: 1) authorizing the issuance of the attached Rule 17(c) Subpoenas; 2) compelling MLB to comply with the MLB Subpoena prior to trial to avoid any unnecessary delays of trial in this cause; and 3) compelling the USAO to comply with the USAO Subpoena prior to trial to avoid any unnecessary delays of trial in this cause.

**WHEREFORE**, the Defendant, Lazaro Collazo moves this Court to authorize the issuance of Rule 17(c) Subpoenas and Order MLB and the USAO to comply with the Subpoenas prior to trial, as well as any other relief this Court deems just and proper.

31

QUINTERO BROCHE
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed via

CM/ECF this __20th__ day of November, 2014 to: Assistant United States Attorney, Sharad A.

Motiani, 99 NE 4th St., Miami, Florida 33132, and Kobre & Kim, LLP, c/o John D. Couriel,

John.Couriel@kobrekim.com, 2 South Biscayne Boulevard, 35th Floor, Miami, Florida 33131.

Respectfully submitted,

QUINTERO BROCHE, P.A.
Attorney for Defendant
75 Valencia Ave., 8th Floor
Coral Gables, Florida 33134
Tel.:  (305) 446-0303
Fax:   (305) 446-4503

By:   ___/s/Frank Quintero, Jr.___
FRANK QUINTERO, JR.
Florida Bar No.: 399167

QUINTERO BROCHE™
75 Valencia Avenue • Suite 800 • Coral Gables, Florida 33134
Tel: (305) 446-0303 • Fax: (305) 446-4503